Kilty, Chancellor.
The plaintiffs claimed certain wharves in the city of Baltimore, and the object was to have the *362 wharfage at those wharves held separate to be accounted for and paid over as. should be ultimately determined by the court who is entitled to the wharfage. But, if this point is to be decided, it must be after a decision at law upon the right; and it does not appear that'any action has been, or is intended to be brought for the purpose of trying the right; and the title of the plaintiffs does not appear sufficiently clear and strong. The bill in this case was altered; and an order passed appointing the collector of the city of Baltimore as receiver, with power to pay over to The Mayor, See. and to keep an account, &c.
After which the plaintiff McElderry died, and another suit was instituted in this court by the plaintiff Dugan and the heirs of McElderry against these defendants; and the cases having been brought on to be heard, it was agreed, on the 29th of April, 1831, that in the place of the copy, which had been shortly before received, a new bill should be filed, as an original bill, in lieu of the first one; and that the answer to the first bill should be filed and considered as an answer thereto.
In this new bill, filed on the 11th of May, 1837, it is stated, that by the act of 1784, ch. 62, all that parcel of ground in Baltimore, now commonly called Market space, extending from Baltimore street south, parallel 'with Gay street, of the width of one hundred and fifty feet to Water street, with the privilege of extending the same to the channel, became vested in the then commissioners of Baltimore town, to hold for the purpose of erecting a market-house thereon; and for the use of the then town, in like manner as if they had been constituted a body politic; that in the year 1794, the common tide flowed within this space up to and over Water street; that this plaintiff Dugan being seised in fee simple of the ground on the west side of Market space, extending from the north side of Pratt street to the water; and the plaintiff McElderry being seised in fee simple of the ground on the east side of Market space, extending from the north side of Pratt street to the water, they, on the 10th of February, 1794, made the following 'proposition to the then commissioners of Baltimore town,
‘We, the subscribers, request your permission for making a canal and wharf at our expense, in the Market space from the south side of Pratt street to the channel or port-warden’s line; the canal to be eighty feet wide, and the streets on each side the same to be thirty-five feet wide; the said canal, wharf, and streets *363 to be made public for the use of the inhabitants, under the laws and regulations of your board; and the whole of the same to be relinquished up to the commissioners whenever the same, or any part thereof may be wanted for market-houses.’
The commissioners took this proposition into consideration, and agreed to it upon the following terms and conditions.
‘The commissioners of Baltimore town, having considered the above application, have no objection to Mr. Thomas McElderry and Mr. Cumberland Dugan filling up the space of one hundred and fifty feet wide, on a line with the present Market space, from Water street as far as a line drawn from the south side of Pratt street shall intersect or cross the said space; and, after filling up the said space, the commissioners have no objection to their making a canal from the said line of intersection to the channel of sixty feet wide, with wharves and a street on each side of said canal of forty-five feet wride. But with this express declaration, that the privilege of filling up said canal, and of the whole space of one hundred and fifty feet wide be fully reserved to the said commissioners, and their successors for the use of the said town, as granted by the act of Assembly, of November session, 1784, ch. 62, entitled, an act for establishing new markets, &c. And also on the express condition, that the said canal, wharves and streets on each side of the said canal be a common highway, and free for the public use, and subject to such regulations as the commissioners and their successors shall from time to time establish. And on this further express condition, that the said McElderry and Dugan extend Pratt street through their two lots of ground on each side of Market space, and leave Pratt street of the width of sixty feet through their said lots forever as a street for the use of the public.’
The bill further states, that under this authority these plaintiffs proceeded immediately to fill up the specified space; that they filled up and made fast land of the whole of this ground, called Market space, extending into the water, from Water street to the south side of Pratt street, a distance of three hundred feet; and from Pratt street to the channel, they made a canal and wharves as specified, extending further into the water, a distance of one thousand feet; and fully completed the whole according to the terms of their contract in the years 1795 and 1796; that the expense of the work wTas borne by each of these plaintiffs to the extent of the grounds held by each, thereby giving to each, as the *364 result of his separate burthen, a distinct right to all the benefits arising from or incident to his separate estate, as a right, privilege and interest to be held in severalty, and not as joint tenants or tenants in common.
The bill further states, that by virtue of this contract with these plaintiffs, and of their compliance therewith, a right accrued to each of them to demand and receive wharfage for any vessel which should lie at, or property which should be landed upon the wharves made by them respectively; which right will continue to belong to each of them until the reserved privilege of filling up the canal, and the whole space shall be exercised; which has not yet been done; that so soon as the work was completed these plaintiffs severally exercised their right to charge wharfage; and continued to receive it, without molestation, from the year 1795 until some time in the year 1799; that after these defendants, as a body politic, created by the act of 1796, ch. 68, had succeeded to the rights of the commissioners of Baltimore town, they took upon themselves to collect wharfage on those wharves, and have collected a large amount, and altogether prevented these plaintiffs from collecting any thing on that account. Whereupon these plaintiffs prayed, that they might have an account of the wharfage so illegally received by the defendants; that they might be quieted in their rights, and have such other relief as the nature of their case might require.
In the copy of the answer, made by The Mayor and City -Council of Baltimore, to the original bill, which seems to have been filed in April, 1807, and which it had been agreed should be received as an answer to this new bill, it was admitted, that the land called Market space was vested in the commissioners of Baltimore town; that the plaintiffs were the owners of the grounds immediately adjacent; that they entered into the contract with the commissioners; that they accordingly filled up the space and made the canal and wharves as stated; which, however, they did not finally complete until some time in the year 1797. And it was further admitted, that these defendants, having succeeded to the rights of the commissioners of Baltimore town, and being the sole owners of the wharves at the head and sides of the canal, have collected, as they were legally warranted in doing, a large amount of money for wharfage from various persons for the use of those wharves. These defendants deny the right of the plaintiffs to collect wharfage, the claim to which they never made until the *365 exhibition of their bill; and these defendants aver, that, although it may be, that they have expended large sums of money in complying with their contract; yet that the filling up of the ground, and making the canal, has very considerably increased the value of the property belonging to them. These defendants aver, that the wharves, made as described, were always considered as public wharves belonging to the city of Baltimore; and, as such, wharf-age was collected for the use of them, in like manner as for the use of other public wharves; and they aver, that the plaintiffs had collected the wharfage on those wharves, as commissioners appointed by and for the city, up to the time of filing their bill.
On the 1st of June, 1815, another bill was filed by Cumberland Dugan and the widow and heirs of Thomas McElderry, deceased, against The Mayor and City Council of Baltimore. In this bill the plaintiffs, alter stating the circumstances in relation to the making of the wharves in Market space, as set forth in the first bill, allege, that the defendants had been prohibited by the act of 1813, ch. 118, from collecting wharfage for the use of any public wharf; and yet had imposed wharfage for the use of the wharves made by these plaintiffs, and had collected a large amount to the exclusion of these plaintiffs, who alone had the right to the wharf-age for the use of those wharves. Wherefore they prayed for an injunction, and for general relief. This bill was sworn to by only two of the plaintiffs.
12th June, 1815.
Kilty, Chancellor.
The bill for an injunction in this case has been for some time under consideration. On account of the nature of the dispute, and the caution that is necessary in interfering with the legislative acts of an incorporated town. But where such a corporate body frames its acts in opposition to a law of the state on the subject matter, the persons aggrieved are entitled to the aid of this court, and its restraining power cannot with justice be refused.
The Chancellor is of opinion, that the part of the ordinance of March 25th, 1815, charging rates on the articles, therein enumerated, landed on any public wharf, is a palpable evasion of the act of Assembly, 1813, ch. 118; attempting, by a seeming adherence to the letter, to contravene the intention of that law, as plainly appears by the proviso in that section of the ordinance, as well as from a consideration of the manner in which wharves are used by landing goods for the purpose of passing them over, or passing oyer goods, wdiieh must be previously landed. In supposing The *366 Mayor and City Council to have the right to make such an ordinance, it could not lawfully be evaded by passing over goods on planks, skids, or even in drays or carts, so as not to touch or be landed on the wharves.
The ordinance of March 21st, 1814, does not appear to be contrary to the prohibition contained in the act of Assembly of 1813, ch. 118, inasmuch as the wharfage on vessels lying at the public wharves is not mentioned in the latter, and the rates or duties are different in their kind.
On the first part of the bill respecting the rights of the parties no further opinion is expressed than as to the ostensible right of the complainants, which is sufficient to sustain the application for an injunction.
It is therefore Ordered, that an injunction be issued prohibiting The Mayor and City Council, their officers, agents, and servants from collecting any rates or wharfage, or other tax, charge, or duty in virtue of the first part of the second section of the ordinance of March 25th, 1815, in the bill mentioned and referred to, by which part of the said ordinance, rates were directed to be charged and collected on certain articles landed on any public wharf, that is to say, on the public wharves in the bill mentioned, made by Thomas McElderry, deceased, and Cumberland Dugan.
The defendants on the 1st of March, 1830, put in their answer to this last bill, in which they admit the truth of all that is said in relation to the making of the wharves; but deny, that the plaintiffs have any title to the ground so filled up by them, or any right to collect wharfage on the wharves they had so made. These defendants aver, that the act of 1813, ch. 118, does not apply to wharves of the description of these; but only to those which are properly public and free wharves; that these wharves are exclusively the property of the corporation, public only for the use of the inhabitants; that since the service of the injunction on these •defendants, they had entered into an agreement with the plaintiff Dugan, according to which they have continued to collect wharf-age on the west side of the canal; and that the other plaintiffs have, for a long time, ceased to consider themselves interested in this cause.
On the 1st of March, 1830, The Mayor and City Council of Baltimore, filed their bill here against Cumberland Dugan, in which they set forth all the circumstances as admitted or averred *367 by them in their answers to the two previous bills against them ; and they stated, that they had, by an ordinance of the 3d of April, 1825, established a rate of tonnage duties demandable of all vessels for lying at any of the public wharves, which they had collected accordingly until hindered and prevented by the defendant, who had, under a pretended right that those duties belonged to him, proceeded to enforce the payment thereof from sundry masters of vessels to a very large amount of money. Whereupon they prayed for an injdnction; that a receiver might be appointed and for general relief. This bill was certified under the seal of the corporation to be true; and was also sworn to by the harbourmaster of the city.
1st March, 1830.
Bland, Chancellor.—
Ordered, that the register issue writs of subpoena and injunction as prayed by the foregoing bill of complaint. And it is further Ordered, that the harbour-master, or other officer, who now is, or hereafter may be appointed by the said plaintiffs to collect the wharfage or tonnage on their behalf on the west side of the said canal or dock in the said bill mentioned, be and he is hereby authorized and directed to continue to collect, receive, account for, and pay over the same according to the directions, authority, and power vested in him by the said plaintiffs. And he is hereby directed and required to make out and keep a separate and distinct account of the moneys so collected and received by him; and to make return thereof to this court on oath when required, to the end, that the same may be retained or paid according as the right thereto shall be made to appear. (a)
To this bill the defendant put in his answer, on the 17th of July, 1830, in which he admitted all that was set forth in relation to the formation of the wharves, the passing of the ordinances; and the plaintiffs pretending to have a well-founded claim; but he denied the right of the plaintiffs to make such collections; and averred, that their doing so was in violation of his previously vested rights; that he, as the owner of a lot of ground, binding on the tide-water, and on Market space, had legally extended the fast land of his lot, along Market space into the water by fdling it up as far as the line established by the port wardens; and thereby had acquired a complete legal title to the land thus gained from *368 i'tlie tide, and being so entitled to it, all the appurtenant and inei'dental benefits and advantages thereof accrued to him as its owner; '■that having, under his contract with the commissioners of Baltimore town, at an enormous expense filled up the grounds and made the wharves in that part of Market space binding on his lot so extended, a right accrued to him in consideration thereof to ■demand and receive wharfage on those wharves, of which he could ■not be deprived by these plaintiffs so long as they permitted the «canal and wharves to remain.
The plaintiffs having put in a general replication to this answer, 'a commission was issued and testimony taken and returned, from which it appeared, that at times wharfage had been collected by Dugan, and at other times by the city authorities. After the return ■of the commission with the testimony, the parties filed the following agreement in .relation to these three cases.
‘The above bills being cross bills and concerning the same subject matter, it is agreed, that they be all set down for final hearing together; and that the testimony taken or admitted in either case be considered and received as testimony in all of the above cases. That the agreement and compromise with the McElderrys made by The Mayor and. City Council be filed as evidence in the cases; and that further proof after a decree is passed in these cases may be taken by either party before the auditor in order to shew the ■amount of wharfage received by either party on the wharfage in question.’
13th June, 1831.
Bland, Chancellor.
These cases standing ready for hearing, and the solicitors of the parties having been fully heard, the cases were, by consent, permitted to stand over with leave to amend the pleadings, which having been made, they were submitted without further argument, whereupon the proceedings were read and considered.
This case might have been as well brought before the court in. one as by all three of these bills, since they all alike present the same questions, whether the right to demand and receive wharfage upon these wharves belongs exclusively to The Mayor and City Council of Baltimore; or to Cumberland Dugan} I shall therefore consolidate the cases and dismiss them as to the heirs of Thomas McElderry, deceased, who seem, by their neglect, and by the compromise of the city with some of them, and with others who claim under them, or their ancestor, to have abandoned the case; thus leaving the controversy to be decided between the City of Baltimore and Dugan alone.
*369 The argument was confined to a consideration of the acts of Assembly, the contract of the 10th of February, 1794, and the city ordinances; but the case involves interests of a much wider range; it is one which requires to be investigated not only in relation to the immediate rights of these parties; but as to the manner in which it affects the course of commerce in a great public seaport ; and as it regards the uses which those who resort to that port have a right to make of those wharves. The public as well as these parties, therefore, have a deep concern in the questions now to be determined. (b)
A wharf, like a road, may certainly be made on private property; and the one or the other may be as exclusively the property of an individual as his house, or any other portion of his separate estate. A wharf is a building which is always an encroachment on navigable water; because, unless its boundary wall were to extend beyond high water mark, vessels could not approach and lay at it. (c) But these are open wharves in a great public seaport ; they are parcel of a public place dedicated to commerce; a place to which all have a right to resort, subject to certain legal regulations. A wharf of this description must always be viewed as a part of the port in which it is situated; it cannot be considered as a thing unconnected with the port itself; because it is subject to the law of the port; and, as is admitted in this instance, the claim of wharfage, who ever may be allowed to profit by it, must be controlled by that law. (d)
A port, in common sea phrase, may be said to be any safe station for ships; but, in law, it is described to be a place for arriving and lading and unlading of ships in a manner prescribed by law; and near to which is a city or town for the accommodation of mariners and the securing and vending of merchandise. So that in this sense a public port is a complex subject, consisting of somewhat that is natural, as a convenient access from the sea, a safe situation against winds, and a shore upon which vessels may well unlade; something that is artificial, as keys, wharves and warehouses; and something that is civil, as privileges and regulations given to it by the government. A public port often includes more than the bare place where ships lade or unlade; it is some *370 times extended many miles, including several places as members of the port; designating one as a port of entry, and another as a port of delivery. And this is the case in England as well as in this country. (e)
The public ports are considered as the great gates of the republic, through which all its foreign intercourse by sea is conducted; and, consequently, they can only be established; and must, in some respects, be regulated by that department of the government to which has been delegated the care of its foreign concerns. In England the power to establish ports is one of the prerogatives of the king; (f) and by the charier of Maryland a similar prerogative was given to the Lord Proprietary, which he always claimed accordingly, (g) But, as all the regulations necessary for the government of ports could not be established by the exercise of such a prerogative alone, several attempts were made by the General Assembly of the province, as well when the government was in the hands of the Lord Proprietary, as when it was held by the English monarch, to establish and regulate ports; almost all of which failed; because, as it would seem, of the nature of the country, and the peculiar manner in which its trade was then carried on. All the then settlements were within very short distances of one or other of the navigable branches of the Chesapeake; and and as tobacco was the chief, or almost only commodity of exportation, which instead of being gathered,.as at present, in great masses, at the principal ports, was, after being packed in hogsheads, rolled to the nearest point of a navigable river, to a landing, or to a rolling house, along rolling roads, as they were then called, which were opened and established for the purpose, and so shipped from such places. (h)
*371 It is obvious, however, that the legal establishment and regulation of all ports, to the extent to which the regulation of marine commerce, and the collection of revenue from it, have been delegated to the government of the Union, must necessarily fall within the scope of its authority, as incident to those powers; for, without the power to confine such trade to certain specified ports, it would be difficult or impossible to collect duties on the tonnage of ships or the importation of merchandise. Upon these principles, therefore, all the public ports of the United States, since the establishment of the federal government, have been described, and, in a great measure, regulated, as such, under its authority. (i)
In all public ports there are three kinds of rights, the distinct nature of which, owing to the peculiar form of our government, it becomes more necessary to attend to here than in England. There are, first, public rights, affecting commerce in general, or those in relation to vrar and foreign intercourse; secondly, public rights involving the powers of the internal government of the Republic; and lastly, private rights, such as the ownership of the soil, or any peculiar franchise.
It is declared by the federal constitution, that ‘no preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another;’ that ‘no stale shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws;’ and that ‘no state shall, wdthout the consent of Congress, lay any duty of tonnage.’ (j)
These rules being fundamental cannot be evaded in any manner whatever; no preference can be given by requiring the payment of tolls or wharfage of any ships or goods, coming from other states of the Union, not demandable on those of this state; nor can duties or tonnage of any kind be exacted of ships or goods coming into our ports from any other of the United States, or from any foreign country, without the consent of Congress. And although it had been found expedient to collect in the port of Baltimore, and in many others of the ports of this Union, as in England, a small duty of tonnage, or port duty, to be appropriated to the sole purpose of clearing the port itself of all obstructions, and keeping it in good navigable order, and for repairing the public *372 wharves; (k), yet even that small duty, which might have been considered as a toll paid only for the use of the port itself, was held to fall within the scope of those constitutional provisions, and not allowable without the consent of Congress, which was given to that act of Assembly by Congress. (l) And which consent has been, from time to time, renewed since, as it has been found expedient or necessary to raise a fund, in that way, for clearing the port and repairing the public wharves, (m) And so, too, as a means of regulating commerce and preventing, preparing for, or of adding to the energies of war, the federal government has the power to lay an embargo ; and thus, for a season, partially to interrupt the use of all wharves, by closing the public ports altogether against all foreign intercourse. (n)
Those public rights within a port which are involved in the exclusive internal government of the Republic, in all cases fall within the range of the powers of the state government; yet if the port itself be not within the body of a county; but, as an arm of the sea, be within the jurisdiction of the admiralty, then, as to acts committed in it; and as to all acts in any port which come within the jurisdiction of the admiralty, the tribunals of the state can take no cognizance of them; because the judicial power of the United States is extended to all cases of admiralty and maritime jurisdiction, (o) But in all cases where the tribunals of the states have an exclusive or concurrent jurisdiction, the state government may make and enforce all needful regulations-for the purpose of giving a salutary system of police to the port itself, and its town, especially in so far as it may be within the body of a county, as is the fact of the port of Baltimore, (p)
Private rights in a public port may be of various kinds; but all of them are subject to those public rights, the regulation of which have been left either with the state, or delegated to the federal department of the government of our Republic. Any individual holder of the shore of a navigable river or haven may use it for the purpose of landing his own goods which are not chargeable with any duty; or he may suffer another to do so, upon any terms *373 he may think proper to impose; but no goods which are chargeable with a duty can be landed in any other place than a public port. (q) A right of property in a public port itself may give to an individual a right to demand and receive tolls of various denominations ; of which anchorage is an example. It has been determined, that land covered by navigable wrnter may be granted by the state to an individual, (r) Whence it would seem to follow, that if the land covered by the navigable water of a public port was held as private property by an individual, he might have a right to demand and receive a reasonable toll for anchorage in the port, in respect of his property in the soil, and as an evidence of it. (s)
But the most common kind of private rights in a public port, are those which arise from an ownership of the adjacent shores. It is rare to find any port where suitable wharves, keys, and warehouses have not been built for the convenient mooring of ships, and the lading and unlading, and protection of merchandise; and wdiere they have been erected it is most common that some duties are demandable for the use of all of them. These shore duties, as they are called, are of several kinds; but those which are the subject of the present controversy are, first, moorage, which is a sum due by law or usage for mooring or fastening of ships to trees or posts at the shore, or to a wharf; and secondly, wharfage, which is a toll or duty for the pitching or lodging of goods upon a wharf, (t) These two kind of shore duties, as thus designated in the English books, which are evidently distinct in their nature, the one as a charge for the accommodation of ships, the other as a toll for the use of a landing place for goods, are, in our country, generally, and certainly in the port of Baltimore, spoken of under the one common denomination of wharfage, the wharfage due from a vessel, and the wharfage payable on merchandise, (u) And this, perhaps, has arisen from the fact of no duty being demanded of ships which have been moored to the shore where there was no wharf.
All those shore duties demandable by an individual, which are affected by public rights, are not, therefore, held upon the same terms as private property of any other description. No man can *374 erect a new public port without the sanction of the government; nor can he take, out of a port, any certain rates of wharfage for landing merchandise, although he may make particular agreements with every one who comes to his wharf or shore, by his consent, to land goods. And so, too, a man, for his own private advantage, may build a wharf in a public port, and take what rates for the use of it, he and his customers can agree upon, for in that he does no more than is lawful in making the most of his own. (w)
But it is otherwise of those wharves belonging to individuals, which have been legally thrown open to the use of the public, and also with regard to those which are entirely and properly public wharves. As to all such as belong to individuals, or a body politic, which are affected with a public interest, the wharfage must be reasonable ; and, after having been once legally adjusted, cannot be enhanced to an immoderate amount. Such wharves are subject to some statutory regulations in England; (x) and here they are particularly alluded to in several of our acts of Congress regulating the collection of revenue from goods imported, as places dedicated to the use of that commerce which the federal government alone has a right to regulate; and, consequently, no wharf-age can be demanded for the use of any such wharf in a public port, either to an amount, or in a manner, so as in any way to give a preference prohibited by the federal constitution, or to interfere vrith the regulation of commerce, or the collection of such revenue by the federal government.
This I take to be the true intention of the provisions of the federal constitution in relation to the regulation of commerce, and the laying of duties on imports as declared by various acts of Congress, and admitted by our own legislative enactments, (y) And therefore, upon these principles I hold the act of Assembly which authorizes The Mayor and City Council of Baltimore to charge and collect such wharfage as they may think reasonable, from all vessels lying at or landing articles, other than the productions of this state, on any wharf belonging to The Mayor and City Council, or any public wharf of the city, to be unconstitutional and void. (z)
Where an individual is the owner of any such wharf to which *375 all persons may lawfully come for the purpose of lading or unlading their goods, he may be allowed by law to demand and receive certain specified and reasonable tolls for its use; because of his having expressly undertaken to he at all the charge of maintaining and repairing it. But in all eases, where the entire right of soil has been vested in the public, or where the wharf itself, or the place on which it has been built by public authority, has been condemned, or dedicated in any way to the use of the public, there no toll of any kind can be demanded; for, a toll is in the nature of a tax upon the people; and no tax of any description can he levied without the express sanction of the General Assembly, (a) Such a wharf may, however, be so regulated as to be made most generally and equally beneficial to all. (b) And where a wharf, like a road, or a street, has been once laid open and made free to all, no toll of any kind can afterwards be charged for the use of it, by any individual or body politic, who may happen to be the owner of the soil on which the wharf has been erected, or over which the road or street passes, (c) Nor, upon the principles admitted, in regard to the tonnage or port duties imposed by the before mentioned acts of Assembly, for the benefit of the port of Baltimore, and assented to by Congress, can the Legislature of the stale, after a wharf or street, along the shore of a port, had been once dedicated to the public, free of all charge, impose any toll so as to infringe upon the rights secured, or the power granted to the federal government; which authorizes the charging of wharfage for the landing of articles other than the productions of this state. (d)
In this case, therefore, it is not only important as regards the interests of these contending parties themselves, that the title to charge wharfage for the use of these wharves should be clearly shewn; but it is also necessary that the right now claimed should be distinctly ascertained for the benefit of the people at large, and to prevent the federal and state governments from being brought into collision, by means of a wharfage duty collected under a state authority, pushing aside, or interfering with those on importations proposed to be collected under the federal government.
*376 In regard to the subject of this controversy, it appears from the various legislative enactments in relation to it, that in the year 1766, the inhabitants of Baltimore, by their petition to the General Assembly, set forth that a large miry marsh, adjoining the town, was very prejudicial to the health of its inhabitants ; and that the proprietors thereof, by their perverseness, or dilatoriness, had refused or neglected to remove the nuisance, which could only be done by changing the surface of the marsh into firm dry ground. Whereupon it was enacted, that Thomas Harrison, &c., the owners of the said marsh, should, within one month after the end of that session of Assembly, give bond in a certain penalty, with surety to be approved by the commissioners therein named, within two years from the date, to remove the nuisance, 'by wharfing in all suck marshy ground next the water,"1 &c.; and should also ‘cover all such marshy ground with stones, gravel, sand, or dirt, so as to raise the same not less than two feet above the level of common flood tides.’ And it was further declared, that the said marshy ground should be laid out by the said commissioners into streets, lanes, and alleys, and thenceforth be deemed a part of Baltimore town. And in case the said Thomas Harrison should neglect to give bond as required, then the said commissioners were to have the ground divided into lots, and sold upon condition, to ‘wharf in and secure all such marshy ground next the water,’ and also to have the same raised above tide as aforesaid, (e) After which Thomas Harrison gave bond as required, but not having been able to comply with its conditions within the time specified, he was allowed a further time; (f) which time was again extended by the Legislature. (g)
*377 It further appears, that Thomas Harrison had, on the 4th of June, 1763, leased a certain lot of land in Baltimore town unto its commissioners for ninety-nine years, renewable for ever, reserving certain rent, upon which the inhabitants had erected a large building calculated for a market-house and other public uses, which lease the General Assembly by law ratified and confirmed. (h)
Some time after which Thomas Harrison, by his petition to the General Assembly, stated that he had accomplished his undertaking by converting the said marsh into firm ground, which had been laid out as an addition to Baltimore; ‘and that the altering and laying out anew the said streets, lanes, and alleys, and opening' a canal, leading from Baltimore street to the basin, would render the adjacent lots more convenient, conduce much to the advantage of that part of Baltimore town, and be the means of effectually draining the said marsh, without occasioning any detriment to the public.’ Whereupon it was enacted accordingly, that the ground should be laid out anew; and that the canal should be opened, (i) After which an act was passed by the Legislature for the appointment of port wardens for Baltimore, who vreve directed to make a survey of the port, and of the course of the channel; and it was declared, that no wharf should be made, altered, or extended to the line of the channel, since commonly called the port warden’s line, without their permission. (j)
From these legislative enactments it will be seen, that the making of wharves was one of the means by which this marshy ground, so added to Baltimore, was to be reclaimed; and that the wharves, thus required to be made, so far as they extended across and in front of the end of any streets, or other portions of that ground, so dedicated to the use of the public, must have been considered, like the streets themselves, public and free to the use of all, without paying toll of any kind; that the canal spoken of as ‘leading from Baltimore street to the basin,’ the lots adjacent to which would thereby be rendered more convenient; and as being ‘the means of effectually draining the said marsh,’ must have been a kind of cul de sac, or dock extending from the basin up into a wide space of it, with a street or landing place on each side; and as the marshy ground was to be ‘secured next the water by wharves,’ it is evident that such a canal or dock would give a
*378 ■ much longer line of wharf, and thus ‘conduce much to the advantage of that part of Baltimore townand that with a view to this, ,and other advantages, the streets, lanes, and alleys, which had been -previously laid out over this ground, were to be altered and laid out anew. ' And it appears that a large building had been erected, and was then used as a market-house, and for other public purposes, on a lot, not a part of the marshy ground, which had been leased by Baltimore town, A recollection of the provisions of these legislative enactments, is necessary to a correct understanding of that which follows.
In the year 1784, it was represented to the General Assembly, that the then market-house of Baltimore was insufficient for the use of the town; and that two convenient places might be had for erecting market-houses, ‘the one on that part of Baltimore town commonly called Harrison’s marsh, and the other to the westward of the basin.’ Whereupon it was enacted, that Samuel Smith and others, ‘or a major part of them, shall have full power ■ and authority by this act to build and erect a market-house on a parcel of ground situate in the said town, opposite Harrison street, beginning on Baltimore street, and running thence south, parallel with Gay street, of the width of one hundred and fifty feet, to Water street, with the privilege of extending the same to the channel; and that the said market-house, when erected, and the ground whereon the same shall be built, with the privilege aforesaid, shall be, and is hereby declared to be vested in the commissioners of Baltimore town, and their successors, forever, from and immediately after the said market-house shall be built and erected, to hold, possess, and enjoy the same market-house, ground, and • privilege aforesaid, to and for the use and benefit of the said town, in as full and ample manner as if the said commissioners had been legally constituted a body politic and corporate in deed and in name.’ (k) And it was further declared in the same act, that the commissioners of Baltimore town, as soon as convenient, ‘after the new market-house on the said marsh shall be extended and built up, for the length of three hundred feet from Baltimore street, to lay off the ground which was heretofore leased for the use of the present market-house into convenient lots, and the same, together with the buildings thereon, set up and expose to public sale to the highest bidder, under such conditions as they may *379 think proper, and three-fourths of the moneys arising from the sale of the same, when sold, to appropriate for building and erecting the said new market-house on the said marsh, and completing the public wharves adjoining the same.;1 and the other fourth to defray the expense of building the market-house to the westward of the basin. (l)
This parcel of ground on which this new market-house was to be built is thus described as extending one hundred and fifty feet in width, from Baltimore street to Water street, ‘with the privilege of extending the same to the channel;’ and consequently, ‘the public wharves adjoining the same,’ for the completion of which this law, thus in part provided the means, could only have been those public wharves in front of so much of this marshy ground as had been previously dedicated to the public, which its former owners had, as required, filled up and made in order to remove the nuisance complained of; and which, therefore, must have been, from their foundation, and always considered and treated as public wharves. This parcel of ground had been thus expressly dedicated to the use of the public for a market-house and wharves; and this law has not only named these two public uses, and authorized the application of certain public funds to defray the expense of making this ground useful to the public in both of those modes; but it has expressly declared, that it was held by the public ‘with the privilege of extending the same to the channel.’ It is not said how, or in what form this privilege is to be exercised; and hence, it is perfectly obvious, that it must give to the owners of the ground, within the specified extent, a right to alter the location and form of those public wharves at pleasure; they must be allowed to have, under this general privilege, the right to raise the ground above high-water mark, and to remove their wharves further in towards the channel; to have the right to give to their wharves the shape of a canal or dock, as had been, formerly said to be most advantageous; or to make a short transverse wharf abutment immediately along the specified line of the channel. But whatever may be the location or form of such wharves they must, nevertheless, be considered and treated as ‘the public wharves adjoining’ to this ground, according to the clear and express terms of this law. And having been thus, by several solemn legislative enactments provided for and declared to be *380 public wharves, no alteration in their location or form can divest them of their free, open, and public character; or authorize any person or body politic to demand and receive toll for the use of them in any manner whatever; leaving them, however, according to the express terms of the law, ‘subject to the regulation of the corporation of Baltimore relative to public wharves.’(m)
But even supposing the body politic, in whom the absolute right to this land had been vested, had a right to have levied a toll for the use of any wharf, they themselves might have built upon it; yet the contract of the 10th February, 1794, under which these wharves were actually built by Dugan and McElderry, is totally silent as to tolls of every description. No right is reserved to, either of the contracting parties to demand and receive wharfage for the use of them, when made, any more than for the use of the streets which were to be filled up as specified. On the contrary, it is expressly declared, as a part of that contract, ‘that the said canal, wharves, and streets on each side of the said canal be a common highway, and free for the public use, subject to such regulations as the commissioners and their successors shall from time to time establish.5 Thus by express and mutual consent dedicating these wharves, when made, to the use of the public, as free and unencumbered by toll as any of the public streets of the city.
Finding no express authority either in the law, or in their contract, to demand and collect tolls; these contending parties endeavour to deduce their claim to wharfage, the one from its ownership of the soil, and an obligation to maintain the wharves thus erected; and the other from his merits, as the builder of this costly and valuable work, and from his obligation to keep it in repair.
This ground, ‘commonly called Harrison’s marsh,5 upon which the Legislature had provided for the building of a new market-house and the completion of a then existing public wharf, having been thus vested in the city of Baltimore, as a body politic, and in general for the use of the town, was thereby laid open to the public free of toll; and no toll having been given in the grant by which it was so vested, none can be exacted by it from any one who may use either the market-house or the public wharf For, it is a general rule applicable alike to markets, fairs, wharves, and roads, that where no toll is specially allowed in the grant or law by which they are authorized and laid open, none can be de-. *381 mantled; because toll being a matter of private benefit to the owner of the soil, not necessarily incident to a market, fair, wharf, or road, it cannot be charged in any case unless it be specially allowed, or the owner of the soil, when he dedicates it to the use of the public, then reserves to himself toll from those who pass over it. (n) But in regard to the use of a market, although no *382 toll can be charged for any goods brought into it; yet, to avoid confusion, if any one desires 'to have for himself The convenience of a particular stall; the owners of the market may lawfully charge toll for such a peculiar accommodation, (o)
Whence.it is clear, that The Mayor and City Council of Baltimore, who are the successors of the commissioners of Baltimore town, (p) can have no right whatever to charge wharfage for the use of these wharves, although they are the owners of the soil; because no such right has been reserved or given to them in the grant by which they make title to the property; or has been reserved by the owner thereof at the time of its dedication to the use of the public; and further, because it is strongly to be inferred from the manner in which the grant itself speaks of a public wharf, that the right to collect tolls was intentionally withheld; and moreover, because these are public wharves, and the right to charge wharfage for the use of all such wharves, is expressly prohibited by a late act of Assembly, which leaves them free for the use of all, and like the public streets, to be repaired at the common expense of the city. (q)
It is laid down in general terms, as well in regard to a wharf as a highway, that where an individual citizen is clearly under an *383 obligation to maintain and keep it in repair, he may charge a reasonable toll as a means of enabling him to discharge the duty thus imposed upon him. But then to entitle himself to claim toll upon the ground of his liability, he must shew that he has been actually thus bound; for, if he be not encumbered with any such duty he can make no claim to toil of any sort. (r)
But in this case, however enormous may have been the expense incurred by Dugan and McElderry; and whatever may have been their merits in making these wharves; the whole was nothing more than what was necessary to a faithful compliance with the terms of their contract of the 10th of February, 1794, from which, or any thing else here shewn, it does not appear, that they were under any sort of obligation to maintain and keep them in repair, after they had been once completed, according to the terms of their agreement. The benefit to which they looked, and which they actually derived from the costly work, so completed by them, was that of having an open street, and a free public wharf extending along a line of more than a thousand feet fronting on their lots, on which they could, and did, in fact, by themselves, or their lessees or vendees, erect valuable edifices. And this extensive benefit may fairly be considered as one to which, as prudent men, they might safely have looked for remuneration when they entered into this contract; and as one by which they have since been amply compensated for all their great expense and labour in building these valuable public wharves. There is, therefore, no ground upon which Dugan can be allowed to demand and receive wharf-age for the use of these wharves.
It necessarily follows, from what has been said, not only that neither of these litigating parties have any right to demand and receive toll from any one for the use of these public wharves; but, that the doing so, by either of them, would be a violation of a public right; and yet it appears, from their own account of their proceedings, that they have, each of them, heretofore attempted to exact from, and, in many instances, have succeeded in imposing a tax, for their own emolument, upon the people who used these public wharves. To tolerate such a proceeding any longer would *384 be tacitly to sanction a wrong upon the public and the state; and therefore it must be put a stop to for the future. For, this court, not only can in no case pronounce a judgment against any right of the state which appears upon the record; though not insisted on by any one on its behalf; but, after having thus ascertained, that neither of the litigating parties has any right, it devolves upon the court, as a judicial duty, in all such cases to protect the interests of the state, and the rights of the people, thus manifested by the record, by all the means within its power, from injury, perversion, or violation in any way whatever. (s)
Upon the whole, therefore, it is my opinion, that these public wharves are no more liable to wharfage, than any one of the streets of the city are subject to toll; that these public wharves, like the public streets, are to be regulated by, and kept in repair at the expense of the city alone; and that, for the purpose of protecting the rights and interests of the public, each of these parties must be prohibited from demanding and receiving wharfage or toll of any description for the use of these public wharves.
Whereupon it is Decreed, that these three cases be and they are hereby consolidated, deemed and taken as one case, under the name and style of that which was first instituted. Decreed, that this case be and the same is hereby dismissed without costs, as by or against the widow and all the heirs or legal representatives of Thomas McElderry, deceased. Decreed, that the said Cumberland Dugan be and he is hereby perpetually prohibited and enjoined *385 from demanding or receiving any moorage, wharfage, or toll of any kind, from the owner or holder of any ship or vessel, for laying or mooring her at, or making her fast to any part of the said wharves in the proceedings mentioned; and also from demanding or receiving any wharfage or toll of any description for any goods, wares, or property landed or placed upon or passed over any part of the wharves in the proceedings mentioned. Decreed, that The Mayor and City Council of Baltimore be and they are hereby perpetually prohibited and enjoined, &c., (in like manner.) Decreed, that each party pay his and their own costs, to be taxed by the Register.
From this decree both parties appealed. After which the General Assembly, reciting that a legal dispute existed as to the right to collect wharfage for the use of a portion of Dugan's wharf and McElderry's wharf, in the city of Baltimore, and that it was desirable, without prejudice to the right of any of the parties, so claiming, to provide for the collection of such wharfage, pending the said dispute, enacted, that on application as therein prescribed, the Chancellor should appoint a person to collect wharfage for the use of the said wharves, &c.; 1831, ch. 328. Thus, evidently, assuming the fact and the law to be, contrary to the decision of the Chancellor, that one or the other of these litigating parlies must be entitled to demand and collect wharfage. Upon what constitutional principles can such a legislative enactment be sustained? The Chancellor submitted and executed this law; because, although it might not be regarded as a legislative declaration of a rule, but as a judicial interference by the legislative department with an act and a subject properly falling within the scope of the powers of the judicial department, yet, under the circumstances, it might be deemed most correct in him to leave the matter to be disposed of by the Court of Appeals. For the final decision of which tribunal see Dugan v. The City of Baltimore, 5 G. & J. 357.

 Palmer v. Vaughan, 3 Swan. 173.

 Attorney-General v. Burridge, 6 Exch. Rep. 356; 1 Fowl. Exch. Pra. 257.

 Buszard v. Capel, 13 Com. Law Rep. 379.

 Attorney-General v. Parmeter, 6 Exch. Rep. 373.

 Harg. Law Tracts, 46; The Mayor of Hull v. Horner, Cowp. 107; The Dock Company v. Browne, 22 Com. Law Rep. 23; 1706, ch. 14; 1707, ch. 16, s. 6 and 10; 1784, ch. 79, s. 32; Acts Cong. 31 July, 1789, ch. 5; 2 March, 1799, ch. 128.

 Hale de jure Maris and de Poriibus, 36, 51, 54, 60, 73; 1 Blac. Com. 263; Ball v. Herbert, 3 T. R. 261; Blundell v. Catterall, 7 Com. Law Rep. 91__

 Chart. Maryl. v. 10; 2 Boz. His. Maryl. 574, 623, 633, 644.

 1683, ch. 5; 1696, ch. 24, s. 8; 1706, ch. 14; 1707, ch. 16; 1745, ch. 14; Chal. Pol. An. 367, 380. From these circumstances, both in Maryland and Virginia, the public warehouses for the inspection of tobacco were, before the revolution, often called Rolling Houses. — (1763, ch. 18, s. 36 and 37; 3 Virg. Stat. 394; 4 Virg. Stat. 32.) And even to this day, in Virginia, hogsheads of tobacco are rolled from considerable distances in the interior to the warehouses in Petersburg and Manchester. It is said, that in England, originally Custom Houses were instituted as places for the inspection and safe keeping of merchandise, or as Custody Houses; (Gilbert Court of Exchequer, 214;) like those Rolling Houses of our country.

 Gibbons v. Ogden, 9 Wheat. 193; Wilson v. The Black Bird Creek Marsh Company, 2 Peters, 245.

 Const. U. S., art. 1, s. 9 and 10.

 April, 1763, ch. 24, s. 10 ; Hale de Portibus, 78, 87; Mayor of Yarmouth v. Eaton, 3 Burr, 1402; Casher v. Holmes, 22 Com. Law Rep. 146.

 Acts Cong. 11 Aug. 1790, ch. 43.

 1791, ch. 60 ; Acts Cong. 12 May, 1796, ch. 26.

 Gibbons v. Ogden, 9 Wheat. 192.

 The United States v. Bevans, 3 Wheat. 337; Hastings v. Plater, 1 Bland, 613, note.

 1734, ch. 16; 1753, ch. 27; March, 1774, ch. 18; Gibbons v. Ogden, 9 Wheat. 203.

 Hale de Portibus, 73 ; Acts Cong. 2 March, 1799, ch. 128, s. 27 and 30.

 Browne v. Kennedy, 5 H. & J. 195.

 Hale de Portibus, 74; 1661, ch. 7, s. 1; 1682, ch. 4.

 Hale de Portibus, 76; Mayor of Yarmouth v. Eaton, 3 Burr, 1402.

 Buszard v. Capel, 13 Com. Law Rep. 377.

 Hale de Portibus, 77; 1825, ch. 179, s. 8 and 16.

 Hale de Portibus, 77; 1744, ch. 22, s. 2 and 15; 1817, ch. 225, s. 7; 1822,,ch. 57, s. 7.

 1791, ch. 60.—

 1827, ch. 162, s. 4; Gibbons v. Ogden, 9 Wheat. 196; Brown v. The State of Maryland, 12 Wheat. 442.

 Warrington v. Mosely, 4 Mod. 320; Brett v. Beales, 22 Com. Law Rep. 349; 1744, ch. 22, s. 15; 1753, ch. 28; 1803, ch. 64, s. 4 and 11; 1813, ch. 48; 1816, ch. 257; 1813, ch. 164; 1819, ch. 108; 1820, ch. 72; 1821, ch. 64 and 200.

 1817, ch. 71, s. 7.

 Hale de Portibus, 77, 78; The King v. Winstanley, 3 Exch. Rep. 344; 1817, ch. 71, s. 7, and ch. 225, s. 7.

 1827, ch. 162,s.4;Gibbons v. Ogden, 9 Wheat. 196; Brown v. The State of Maryland, 12 Wheat. 442; The Steam Boat Company v. Livingston, 1 Hopkins, 209.

 1766, ch. 22. A common nuisance is a species of offence against the public, being either the doing of a thing to the annoyance of the people, or the neglecting to do a thing which the common good requires, and which certain persons are bound to do; as by neglecting to repair a highway, bridge, or public river which the party was bound to repair; Jacob Law Dict. v. Nuisance. But this act of Assembly declares the natural condition of a certain tract of land to be a nuisance, and obliges its owner to remove such nuisance by altering and improving its natural condition. But although it may be regarded as a principle of justice necessarily arising out of the very nature of a legal title to property, that no individual or set of individuals should be permitted to determine how the property of another should be managed, altered, or improved for their own especial benefit, or to promote the general salubrity of the country. Yet, as an exception to this rule, a law may be passed providing for cases in which swamps, bogs, or wet land should be drained by ditches and embankments on the land of each owner, for the general benefit; upon the same ground, that the owner of a lot in a city may be compelled to pave the street in front of his lot; Jlraior by John Taylor of Caroline,page 172.

 May, 1768, ch. 22.

 September, 1770, ch. 7.

 1765, ch. 34; Hanson’s Laws, 1773, ch. 8.

 November, 1779, ch. 20.

 April, 1783, ch. 24.

 1784, ch. 62, s. 2.

 1784, ch. 62, s. 4.

 1813, ch. 118; 1817, ch. 71, s.7.

 Hale de Portibus, 51, 73, 76, 78 ; 2 Inst. 220; Smith v. Shepherd, Cro. Eliz. 710 ; Warrington v. Mosely, 4 Mod. 320; Truman v. Walgham, 2 Wils. 296; Colton v. Smith, Cowp.47; Northleigh v. Luscombe, Amb. 612; Mayor of Yarmouth v. Eaton, 3 Burr, 1402 ; Brett v. Beales, 22 Com. Law Rep. 349; 1830, ch. 45, s. 3.
Smith v. Hollingsworth. — This bill was filed on the 13th of October, 1785, by William Smith, George Salmon, Andrew S. Ennells, Peter Hoffman, Aaron Levering, Hans Crevy, John Moale, Andrew Buchanan, Charles Garth, John Merryman, and John McHenry, of Baltimore, in behalf of themselves and others, against Samuel Hollingsworth and Tilomas Hollingsworth. The bill stated, that the plaintiffs were the holders of ground and property in the town of Baltimore, contiguous to Calvert street; that the navigable water of Patapsco river flowed to the end of Calvert street, at which place there was and long had been a public wharf free for the use of the plaintiffs and all others trading to and from the town; by reason of which tree public wharf all the property in its vicinity had been considered to be, and was, in fact, much more valuable; that to exclude the plaintiffs and to draw to themselves the advantages of those benefits of a good landing place on navigable water, the defendants, under pretence of authority, obtained from the port wardens, under the act of April, 1783, ch. 24, bad filled up a space of nine feet wide, in front of this public street and wharf, extending into the water one hundred feet, so as considerably to narrow and obstruct the dimensions of and access to the public wharf; that the defendants are preparing to extend these obstructions two hundred feet further into the harbour; and that the port wardens cannot legally authorize any such filling up, or extension of their fast land as is pretended to have been given to these defendants. Whereupon these plaintiffs prayed, to be quieted in the enjoyment of their ancient rights; that the defendants might be restrained by an injunction; and for general relief, &c. This bill was sworn to by only one of the plaintiffs. And an injunction was granted as prayed.
To this bill the defendants put in their answer, in which they stated, that they were the owners of a lot of ground binding on Calvert street and the navigable water of the river Patapsco, which having a right to improve, according to the provisions of the act of April, 1783, ch. 24, they had accordingly improved and extended into the navigable water; and with the license of the port wardens they had extended the fast land of their lots in front of the street and wharf as alleged in the bill, in all which they were well justified by law, &c.
After the filing of this answer proofs were taken, and the case was brought before the court for final hearing.
5th November, 1787. — Rogers, Chancellor. — The motion of the defendants to dissolve the injunction heretofore issued in tiffs cause, came on to be heard, and argued in the presence of counsel concerned for the parties aforesaid; and the bill, answer, exhibits and proofs, being read, and appearing as hereinbefore set forth; and the said motion being heard and argued by counsel on both side3; and this court being of opinion, upon due consideration, that the wardens of the port of Baltimore town had not authority to grant to the said defendants the permission, in the hill and answer aforesaid mentioned, to extend the public street aforesaid called Calvert *382 street, in Baltimore town, into the harbour or basin of said town, inasmuch as it is expressly provided by the act of Assembly of this state, entitled an act appointing wardens for the port of Baltimore town in Baltimore county, that no wharf shall be extended so as to obstruct the said harbour or basin; and inasmuch as in the opinion of this court no private person had or hath a right to extend a public street, or any part thereof into the said harbour or basin; and the said wardens are only empowered, as .this court conceives, by the said act, so far as it respects thé extension of wharves, to give permission for extension of wharves to persons, who, independent of the said act have a right by law to extend- ground or wharves into the waters of the said harbour, or rather, are only empowered to limit the extension of the ground or wharves of such persons.
• Thereupon it is Decreed, that the said defendants and each of them, be and they and their ministers, agents and servants, hereby are absolutely and perpetually enjoined to desist and surcease from injuring or obstructing the free navigation of the north-west branch of Patapsco river to and from Calvert street in Baltimore town in Baltimore county aforesaid, and the public wharf at the south end of the said Calvert street, by putting earth, stone, timber, or other obstructions in the water of the said river in front of the said street and wharf, and within that space of water of the said north-west branch of Patapsco river, which is and will be included in and by the lines of the east and west sides of Calvert street aforesaid, being run and extended into the said north-west- branch of Patapsco river to the channel thereof.— Chancery Proceedings, lib. S. H. H. letter B, fol. 17.

 The Mayor of Northampton v. Ward, 1 Wils. 114.

 1796, ch. 68.—

 1813, ch. 118; Ex parte Vennor, 3 Atk. 772.

 Hale de Portibus, 78; Smith v. Shepherd, Cro. Eliz. 710; James v. Johnson, 2 Mod. 143; Warrington v. Mosely, 4 Mod. 320; Truman v. Walgham, 2 Wils. 296; Brett v. Beales, 22 Com. Law Rep. 349; Mayor of Yarmouth v. Eaton, 3 Burr, 1402; Colton v. Smith, Cowp. 47.

 Rex v. Leigh, 4 Burr, 2146; Penn v. Lord Baltimore, 1 Ves. 454; Barclay v. Russell, 3 Ves. 436; Gray v. Chaplin, 3 Cond. Chan. Rep. 52; Attorney-General v. Burridge, 6 Exch. Rep. 356; Dolder v. The Bank of England, 10 Ves. 354; Cockey v. Smith, 3 H. & J. 26; Plummer v. Lane, 4 H. & McH. 72.
Stallings v. Brown. — 10th May, 1726. — Calvert, Chancellor. — Upon a full hearing of the whole proceedings in relation to this cause, and upon mature consideration thereupon had, it appears, that the defendant had no right to prosecute the complaint at common law, for that the sole right is in the crown. Thereupon it is Decreed, that the injunction prayed for in the hill be perpetual; and that the defendant pay to the complainant all his costs and charges by him in the said cause laid out and expended. — Chancery Proceedings, lib. S. R. No. l,/ol. 129.
‘When the rights of the crown, (ike state,) were brought forward by the claimant, in a way which it was impossible not to notice, the court was bound, as every court would be, to take care that justice was done to them. The rights of the crown, (the state,) are public rights, conferred not merely for private purposes, or for personal splendour, but for the public service, and to answer the great exigencies of public interest, and claims of justice; as such, they demand the active protection of every court, in which the occurrence of them is suggested to arise. — Per Sir William Scott; The Elsebe, 5 Robinson’s Adm. Rep. 177.